UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

| | |
|---|---|
| Rhode Island Association of Coastal Taxpayers,<br><br>                                    Plaintiff,<br><br>        v.<br><br>Peter Neronha, et al.,<br><br>                                    Defendants. | Case No. 1:23-cv-00278-WES-LDA |

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................ 1

LEGAL BACKGROUND AND FACTS................................................................. 3

    A.   Rhode Island Coastal Property Law............................................... 3

        1.   Shoreline features and terminology ...................................... 3

        2.   Relevant legal background ..................................................... 4

    B.   The Act and Its Effect on Private Property................................. 6

        1.   RIACT members' property..................................................... 6

        2.   The Act ..................................................................................... 8

        3.   The effect of the Act and RIACT's complaint........................ 11

STANDARD OF REVIEW.................................................................................... 12

SUMMARY OF ARGUMENT ............................................................................. 13

ARGUMENT ....................................................................................................... 17

    I.   RIACT IS LIKELY TO SUCCEED ON ITS TAKINGS CLAIM ..................... 17

    A.   RIACT Will Show That the Act Unconstitutionally
        Takes Private Property ...................................................................... 17

        1.   Takings standards ................................................................... 17

        2.   The Act takes property by imposing a public beach easement on
            all private beach land located inland of the MHW line........................... 19

        3.   The legislature cannot disavow common law property rights
            without causing a taking ........................................................ 23

    II.   RIACT HAS NO ADEQUATE COMPENSATORY REMEDY
        DUE TO THE UNCERTAIN SIZE AND SCOPE OF THE
        EASEMENT, AND WILL SUFFER IRREPARABLE HARM
        WITHOUT AN INJUNCTION ........................................................... 24

STATEMENT REQUESTING ORAL ARGUMENT ............................................. 28

CERTIFICATE OF SERVICE.............................................................................. 29

# TABLE OF AUTHORITIES

## Cases

*Asociación De Subscripción Conjunta Del Seguro De Responsabilidad*
  *Obligatorio v. Flores Galarza,*
  484 F.3d 1 (1st Cir. 2007) .................................................................................... 3, 13

*Bell v. Town of Wells,*
  557 A.2d 168 (Me. 1989) ........................................................................................ 22

*Burke-Tarr Co. v. Ferland Corp.,*
  724 A.2d 1014 (R.I. 1999) ...................................................................................... 27

*Cedar Point Nursery v. Hassid,*
  141 S. Ct. 2063 (2021) ............................................... 1, 15, 17–20, 21, 24

*Chamber of Commerce v. Edmondson,*
  594 F.3d 742 (10th Cir. 2010) ............................................................................... 25

*Charlesbank Equity Fund II v. Blinds To Go, Inc.,*
  370 F.3d 151 (1st Cir. 2004) .................................................................................. 13

*Chmielewski v. City of St. Pete Beach,*
  890 F.3d 942 (11th Cir. 2018) ............................................................................... 19

*Condon v. Andino, Inc.,*
  961 F. Supp. 323 (D. Me. 1997) ........................................................................ 16–17

*Di Giovanni v. Camden Fire Ins. Ass'n,*
  296 U.S. 64 (1935) .................................................................................................. 26

*Ex parte Young,*
  209 U.S. 123 (1908) .................................................................................................. 3

*Greater Yellowstone Coal. v. Flowers,*
  321 F.3d 1250 (10th Cir. 2003) ............................................................................. 27

*Hall v. Meisner,*
  51 F.4th 185 (6th Cir. 2022) .................................................................................. 23

*Hendler v. United States,*
  952 F.2d 1364 (Fed. Cir. 1991) ............................................................................. 18

*Hickey v. Town of Burrillville,*
  713 A.2d 781 (R.I. 1998) ..................................................................................... 26–27

*Jackvony v. Powel,*
  21 A.2d 554 (R.I. 1941) ............................................................................................ 5

*Jean v. Mass. State Police,*
    492 F.3d 24 (1st Cir. 2007) .................................................................. 13

*Kaiser Aetna v. United States,*
    444 U.S. 164 (1979) .......................................................................... 18

*Kentucky v. Graham,*
    473 U.S. 159 (1985) .......................................................................... 25

*Lingle v. Chevron U.S.A. Inc.,*
    544 U.S. 528 (2005) ............................................................... 17, 21, 24

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982) ..................................................................... 18, 21

*Maine Forest Products Council v. Cormier,*
    586 F. Supp. 3d 22 (D. Me. 2022) ...................................................... 28

*Narragansett Indian Tribe v. Guilbert,*
    934 F.2d 4 (1st Cir. 1991) ................................................................. 27

*Narragansett Real Estate Co. v. Mackenzie,*
    82 A. 804 (R.I. 1912) .......................................................................... 5

*Newport Hospital v. Ritchie,*
    161 A. 371 (R.I. 1932) ........................................................................ 6

*Nken v. Holder,*
    556 U.S. 418 (2009) .......................................................................... 13

*Nollan v. Cal. Coastal Comm'n,*
    483 U.S. 825 (1987) .................................................... 2, 14–15, 18–20

*Northeastern Corp. v. Zoning Bd. of Review,*
    534 A.2d 603 (R.I. 1987) ..................................................................... 1

*Odebrecht Constr., Inc. v. Sec'y, Florida Dep't of Transp.,*
    715 F.3d 1268 (11th Cir. 2013) ......................................................... 15

*Opinion of the Justices,*
    313 N.E.2d 561 (Mass. 1974) ...................................................... 21–22

*Ortiz De Arroyo v. Barcelo,*
    765 F.2d 275 (1st Cir. 1985) ............................................................. 13

*Pharmaceutical Research & Mfrs. of Am. v. Williams,*
    64 F.4th 932 (8th Cir. 2023) ............................................................. 26

*Phillips v. Washington Legal Found.*,
    524 U.S. 156 (1998) ........................................................................................ 23

*Purdie v. Attorney General*,
    732 A.2d 442 (N.H. 1999) ........................................................................ 21, 23–24

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996) .............................................................. 15–16, 24–26

*Soscia Holdings, LLC v. Rhode Island*,
    No. 22-cv-266, 2023 WL 4230720 (D.R.I. June 15, 2023) ................................. 14

*State v. Ibbison*,
    448 A.2d 728 (R.I. 1982) ..................................................... 5–6, 14, 20, 22

*Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*,
    560 U.S. 702 (2010) ........................................................................................ 23

*Taber v. Hall*,
    51 A. 432 (R.I. 1902) ................................................................................... 6–7

*Terrace v. Thompson*,
    263 U.S. 197 (1923) ............................................................... 16, 25, 27

*United States v. New York*,
    708 F.2d 92 (2d Cir. 1983) ............................................................................. 25

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
    587 F.3d 464 (1st Cir. 2009) ......................................................................... 27

*Verizon Md., Inc. v. Pub. Serv. Comm'n*,
    535 U.S. 635 (2002) ....................................................................................... 13

*Webb's Fabulous Pharmacies v. Beckwith*,
    449 U.S. 155 (1980) ....................................................................................... 23

*Whole Woman's Health v. Jackson*,
    142 S. Ct. 522 (2021) ..................................................................................... 13

*Winter v. Natural Res. Defense Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................... 13

## Constitutions

U.S. Const. amend. V.................................................................................. 17

R.I. Const. art. I, § 16 ............................................................................ 4–5

R.I. Const. art. I, § 17 ................................................................................ 4

## Statute

R.I. Gen. Laws § 11-44-24 ................................................................ 12, 19–20

## Rule

Fed. R. Civ. P. 65 ............................................................................... 1

## Other Authorities

Lateral Access Along the RI Shoreline, Hearing of Special
    Legislative Commission (Mar. 3, 2022), *available at*
    http://ritv.devosvideo.com/show?apg=80e0c946&video=7f
    f103c4e379 (last viewed July 24, 2023) ................................................ 10

Lyness, Sean, *A Doctrine Untethered: "Passage Along the
    Shore" Under the Rhode Island Public Trust Doctrine*,
    26 Roger Williams U. L. Rev. 671 (2021) ............................................ 4

11A Wright, Charles Alan, et al.,
    Federal Practice and Procedure § 2944 (3d ed. 2013).......................... 16

"[G]overnment-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings[.]"

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2074 (2021).

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure Rule 65, Plaintiff Rhode Island Association of Coastal Taxpayers (RIACT) hereby moves the Court to issue a preliminary injunction halting the enforcement of a state law that converts private beachfront land into a public beach area, without just compensation.

Members of RIACT own residentially developed beachfront properties along Rhode Island's coastline. *See* Ex. 1 (Declaration of David Welch (Welch Dec.)) at 1, ¶ 4. Their properties extend to (1) the mean high water (MHW) line, the traditional state law boundary separating public and private beaches, or to (2) the "high water" line, which is more landward than the MHW line, but still seaward of the area converted into a public beach by the challenged state law. *Id.* In short, the private titles of RIACT members include generally dry beach lands located inland of tidal waters. *See Northeastern Corp. v. Zoning Bd. of Review*, 534 A.2d 603, 606 (R.I. 1987) (noting the "well-established principle that in this jurisdiction the line of demarcation that separates the property interests of the waterfront owners from the remaining populace of this state is the mean high-tide line").

The private status of their properties changed drastically, however, on June 26, 2023, when a new state law ("the Act") expanded the public's beach area from the MHW line to *ten feet landward of the high water line*, thereby granting the public access to all private parcels above the MHW line. *See* Ex. 2 (Act). The Act

1

specifically declares that the public's "shore" "rights"—defined by Article I, Section 17, of the state constitution to include a "right of passage"—extend to coastal lands lying ten feet landward of the "recognizable high tide line." The Act locates this line at the line of "seaweed, oil, scum," or "fine shell or debris" found on the shore each day. The Act therefore extends the publicly accessible shore area inland from its historic terminus at the MHW line to the more landward private parcels located ten feet inland of the migratory high tide/seaweed line. The law grants the public a right to invade this private property for beach access purposes, with immediate, unsettling, and unconstitutional effects on RIACT members and all who own beachfront property in Rhode Island. *See* Ex. 1 at 6 (Welch Dec.).

By converting all private land lying between the MHW line and ten feet inland of the high water/seaweed line into a publicly accessible beach area, the Act effectively takes an easement from RIACT members (and all other citizens owning land between the MHW and ten feet inland of the seaweed line) and strips the owners of their right to lawfully exclude strangers from their property. This is a per se taking of property that violates the Fifth Amendment to the United States Constitution. *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 832 (1987) (an unconstitutional taking results from authorization of "a permanent and continuous right [in the public] to pass to and fro, so that the real property may continuously be traversed"). Further, RIACT has no adequate remedy at law because sovereign immunity and valuation difficulties preclude an award of damages for the migrating public easement taken by the Act. It is therefore proper to enjoin state officials from enforcing the Act, and

the Court has power to do so. *Ex parte Young*, 209 U.S. 123 (1908); *Asociación De Subscripción Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1, 24 (1st Cir. 2007).

## LEGAL BACKGROUND AND FACTS

### A.    Rhode Island Coastal Property Law

#### 1.    Shoreline features and terminology

The Rhode Island coastline is generally defined by the following features: (1) the mean low tide (MLT) line, also called the mean low water mark. The MLT line is calculated as the average of low tides over an approximately 19-year period, and is located near open waters; (2) the MHW line (also called the "mean high tide" line),[1] calculated as an average of daily high tides over an approximately 19-year period; (3) the actual or "recognizable" high water line, which is often marked by a seaweed, debris, shell, oil, or wrack line; and (4) the first line of vegetation that spreads continuously inland. *See generally* Ex. 3 at 7 (Final Report of the Special Legislative Commission To Study And Provide Recommendations On The Issues Relating To Lateral Access Along The Rhode Island Shoreline ("Shoreline Commission Report")).

The Act declares that "the actual water line is significantly landward of the MHW line." Ex. 2 at 3:28–29. Indeed, according to Rhode Island Coastal Management Council (CRMC) data and analysis, the high water line/seaweed line is "*never* seaward of the MHW line." *See* Ex. 4 at 3 (Janet Freedman & Megan Higgins, *What*

---

[1] The terms "mean high water line" and "mean high tide line" refer to the same line calculated as an average of daily high tides on the shore over an 18.6 year period. These terms are used interchangeably in this memorandum, though RIACT may use the phrase "mean high water" line more frequently than "mean high tide line" because the Act itself uses that phrase.

*Do You Mean by Mean High Tide? The Public Trust Doctrine in Rhode Island*); *see also*, Ex. 5 (CRMC coastal rights brochure stating that the "mean high tide is seaward of the seaweed line"). Further, the legislative commission that studied and recommended passage of the Act found that the "MHW line is usually *40–60 feet seaward*" of the "seaweed line." Ex. 3 at 6 (Shoreline Commission Report) (emphasis added); *see also*, Sean Lyness, *A Doctrine Untethered: "Passage Along the Shore" Under the Rhode Island Public Trust Doctrine*, 26 Roger Williams U. L. Rev. 671, 679–80 (2021) ("As an average, the mean high water line is further into the water" than the high water line.).

### 2.    Relevant legal background

Article I, Section 17, of the Rhode Island Constitution recognizes the existence of public rights in the "shore," stating:

> The people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have been heretofore entitled under the charter and usages of this state, including but not limited to fishing from the shore, the gathering of seaweed, leaving the shore to swim in the sea and passage along the shore; and they shall be secure in their rights to the use and enjoyment of the natural resources of the state with due regard for the preservation of their values[.]

Article I, Section 16, further states:

> The powers of the state and of its municipalities to regulate and control the use of land and waters in the furtherance of the preservation, regeneration, and restoration of the natural environment, and in furtherance of the protection of the rights of the people to enjoy and freely exercise the rights of fishery and the privileges of the shore, as those rights and duties are set forth in section 17, shall be an exercise

of the police powers of the state, shall be liberally construed, and shall not be deemed to be a public use of private property.

The state constitution does not define the location or extent of the "shore" area to which the public has the right of access and use declared in Article I, Section 17. However, for more than a century, Rhode Island courts have identified *the MHW line* (not the high water/seaweed line) as the landward extent of the public's "shore" area. *Jackvony v. Powel*, 21 A.2d 554, 557 (R.I. 1941) (holding that the state-controlled shore is "between the lines of mean high tide and mean low tide"); *Narragansett Real Estate Co. v. Mackenzie*, 82 A. 804, 806–07 (R.I. 1912) (a private landowner "has title in fee only to ordinary high-water mark, and that the fee of the land below ordinary high-water mark is in the state").

In *State v. Ibbison*, 448 A.2d 728 (R.I. 1982), the Rhode Island Supreme Court emphatically confirmed that the MHW line has always demarcated the extreme landward boundary of the pubic beach under state common law. *Ibbison* considered the issue of at "what point does the shore extend on its landward boundary?" *id.* at 729, and noted that "[t]he setting of this boundary will fix the point at which the land held in trust by the state for the enjoyment of all its people ends and private property belonging to littoral owners begins." *Id.* In *Ibbison*, the state argued that the "mean high tide line" is the public/private beach boundary. *Id.* at 730. The defendants, a group of beachgoers charged with trespassing, argued that the public beach extended inland to the high water line, a point marked by the seaweed line. *Id.* The *Ibbison* court held that, under the common law in Rhode Island, "*the mean-high-tide line [is]*

*the landward boundary of the shore* for the purposes of the privileges guaranteed to the people of this state by our constitution." *Id.* at 732 (emphasis added).

The *Ibbison* court understood that the MHW line is "not readily identifiable by the casual observer," but must be ascertained by scientific methods. *Id.* at 732–33. The court found, however, that the MHW line boundary provides greater certainty than one set at the visible highest tide, and that the latter approach "would unfairly take from littoral owners land that is dry for most of the month." *Id.* at 732. The *Ibbison* court further noted that other coastal states had adopted the MHW line as the private/public beach boundary. *Id.* at 733.

In sum, *Ibbison* (1) recognized that the high water/seaweed line was located landward of the MHW line, and the public would have more beach area if the high water/seaweed line was the boundary, but it (2) rejected the high water line as the landward public beach boundary, and held instead that the boundary existing since the inception of the state under common law lies at the MHW line. *Ibbison* has never been overruled.

## B.    The Act and Its Effect on Private Property

### 1.    RIACT members' property

Given Rhode Island's background law, it is not surprising that coastal land deeds in Rhode Island state that private titles to beachfront property extend to the MHW line/"mean high tide" line or to the "high water line." *See, e.g.*, *Newport Hospital v. Ritchie*, 161 A. 371, 371 (R.I. 1932) (discussing a private title to land adjacent to Sachuest Beach bounded "by the line of mean high tide"); *Taber v. Hall*, 51 A. 432,

434 (R.I. 1902) (discussing a private title that extended to the "high-water mark"). Both types of boundaries (the mean high tide and high water mark) extend private ownership farther toward the sea than a line set at 10 feet inland of the high tide line/seaweed line.

The property owned by RIACT President David Welch provides an illustration. Welch owns a small home on beachfront property in the Charlestown area. Ex. 1 at 2, ¶¶ 5–7 (Welch Dec.). The deed to Welch's property states that portions of his land extend to the "mean high tide line." *Id.* at 2, ¶ 10. There is no recorded or adjudicated public easement on Welch's title. *Id.* at 3, ¶ 17. Welch acquired his property with the expectation that he could exclusively possess and enjoy all of the land within his title, including the dry sandy portion of his property that extends seaward to the "mean high tide" line. *Id.* at 2, ¶¶ 11, 13; *id.* at 3, ¶ 16. The location of the mean high tide or MHW line is regularly surveyed on the beach near Welch's property by his neighbors. *Id.* at 4, ¶ 21. Based on these surveys, Welch estimates that the high water line/seaweed line is usually 20–50 feet landward of the MHW line that demarcates the seaward edge of his ownership. *Id.* at 4, ¶ 22. Welch has guarded the exclusivity of his property lying landward of the MHW line by regularly informing beachgoers that the area above the water line is private property and not open for public use. *Id.* at 3, ¶ 14.

As President of RIACT, Welch has reviewed deeds held by other RIACT members that similarly extend the members' private lot lines to the "mean high tide" line. *Id.* at 1, ¶ 4.

## 2.    The Act

In 2021, a special legislative commission, the Shoreline Commission, was created to study "lateral" shoreline access in the state and make recommendations on the issue to the Rhode Island House of Representatives. Ex. 3 at 4. In 2022, two members of the Shoreline Commission introduced legislation to expand the location of the publicly accessible shore area. *Id.*

On June 26, 2023, the Governor of Rhode Island signed a law passed in the 2023 legislative session entitled, "An Act Relating to Waters and Navigation— Coastal Resources Management Council." The Act's preamble declares, that "[t]he general assembly finds that the lack of a workable, readily identifiable right of access to the shore by the public has led to confusion, conflict and disputes between those attempting to exercise their rights and privileges to the shoreline and the rights of landowners whose property abuts the shore." Ex. 2 at 1:2–5.

The Act recognizes that *Ibbison* set the public beach boundary at the MHW line but declares that

> use of the MHW for determining shoreline access has restricted the public's rights. Retaining the MHW line rule employed by the court in 1982 results in the public only having meaningful shoreline access at or near the time of low tide, if at all, at some locations. Thus, the constitutional right and privileges of the shore delineated in the 1986 Constitutional Convention amendments have become illusory under such a rule.
>
> . . . Insofar as the existing standard for determining the extent of the public's access to the shore is unclear and not easily discernable, due to the lack of a boundary that can be readily seen by the casual observer on the beach, resulting in confusion, uncertainty and even confrontation, the General Assembly is obligated to provide clarity. This enactment

> constitutes the necessary clarification in accordance with Article I Section 17 of the R.I. Constitution.

Ex. 2 at 3:34–4:9.

The Act ultimately declares that "notwithstanding any provision of the general laws to the contrary, *the public's rights and privileges of the shore may be exercised*, where shore exists, on wet sand or dry sand or rocky beach, *up to ten feet (10′) landward of the recognizable high tide line*." *Id.* at 4:29–31.

The Act does not limit public access in the area between the MHW line and ten feet inland except to this extent:

> the public's rights and privileges of the shore shall not be afforded where no passable shore exists, nor on land above the vegetation line, or on lawns, rocky cliffs, sea walls, or other legally constructed shoreline infrastructure. Further, no entitlement is hereby created for the public to use amenities privately owned by other persons or entities, including, but not limited to: cabanas, decks, and beach chairs.

Ex. 2 at 4:31–5:2.

The Act defines "recognizable high tide line" (which functions as the baseline marker for locating the publicly accessible beach area created by the Act) as:

> a line or mark left upon tidal flats, beaches, or along shore objects that indicates the intersection of the land with the water's surface level at the maximum height reached by a rising tide. The recognizable high tide line may be determined by a line of seaweed, oil or scum along shore objects, a more or less continuous deposit of fine shell or debris on the foreshore or berm, other physical markings or characteristics, or other suitable means that delineate the general height reached by the water's surface level at a rising tide. If there is more than one line of seaweed, oil, scum, fine shell, or debris, then the recognizable high tide line means the most seaward line.

*Id.* at 4:15–22.

The Act notes that if there is no physical beach residue available to identify the "recognizable high tide line," that line can be identified by the

> wet line on a sandy or rocky beach. The line encompasses the water's surface level at spring high tides and other high tides that occur with periodic frequency, but does not include the water's surface level at storm surges in which there is a departure from the normal or predicted reach of the water's surface level due to the piling up of water against a coast by strong winds, such as those accompanying a hurricane or other intense storms.

*Id.* at 4:23–28.

During their deliberations, members of the Shoreline Commission stated that "[T]he difference between the actual location of the water" and the MHW line "[i]s . . . 60 feet . . . . *We are actually gaining 60 feet* just by making it the wrack line." Lateral Access Along the RI Shoreline, Hearing of Special Legislative Commission (Mar. 3, 2022) (statement of Michael Rubin at 00:25:50), *available at* http://ritv.devosvideo.com/show?apg=80e0c946&video=7ff103c4e379 (last viewed July 24, 2023) (emphasis added). With respect to granting the public access to an additional ten feet of property beyond (inland of) the high water/seaweed line, another Commission member stated: "My girlfriend and I, we held hands this weekend and we measured how much space we took up when we were walking and it was over four and a half feet, just the width of her and I walking side by side. . . . My perspective is we should provide enough room for two couples walking hand in hand to pass each other on the beach and I'm pretty sure that's 9 to 10 feet." *Id.* at 00:30:22 (statement of Representative Blake Anthony Filippi); *see also*, Ex. 7 at 3.

The Act recognizes that several state agencies will participate in its enforcement, declaring: "The coastal resources management council (CRMC) in

collaboration with the department of environmental management (DEM), shall develop and disseminate information to educate the public and property owners about the rights set out in this section," and that "[t]he CRMC in collaboration with the DEM, and the attorney general, shall determine appropriate language and signage details for use at shoreline locations." Ex. 2 at 5:6–10.

The Act does not include any provision or means to compensate owners of private beachfront lands that are regulated, declared, or treated as a public area under color of the Act.

### 3. The effect of the Act and RIACT's complaint

Following passage of the Act, members of the public intentionally entered onto RIACT members' beachfront properties located near South Kingstown and Charlestown, under color of the Act. Ex. 1 at 4, ¶ 25 (Welch Dec.). Members of the public entered and occupied RIACT President Welch's property and other RIACT members' property in the Charlestown and the South Kingstown beach area between June 30–July 4, 2023. *Id.* at 4, ¶¶ 24–25.

On or about July 3, 2023, a local coastal activist entered Welch's neighbors' beachfront property and orally urged other members of the public present on the beach to enter private property located landward of the seaweed line, under authority of the Act. When the activist approached a private security guard hired by Welch's neighbors, the guard told the activist he could not set up beach equipment on property inland of the water line. Ex. 1 at 4–5, ¶ 26 (Welch Dec.). The activist objected based on the Act and then called the police. *Id.* The activist later apparently asked the

11

Charlestown police to press charges under Rhode Island General Laws § 11-44-24 against the guard for trying to exclude him from privately owned property lying between the MHW and ten feet inland of the seaweed line. *See* Ex. 6 (news stories about post-Act beach confrontations).

Rhode Island General Laws § 11-44-24 states: "Every person who shall obstruct or block or cause any obstruction of any public rights-of-way to water areas of the state shall be imprisoned not exceeding one year or be fined not exceeding five hundred dollars ($500)." Welch and other members of RIACT fear that they can and will be criminally or civilly penalized under Rhode Island General Laws § 11-44-24 if they attempt to stop people from occupying private beach property under color of the Act, and will therefore refrain from excluding members of the public from their property in some instances. Ex. 1 at 5, ¶ 33 (Welch Dec.).

On July 7, 2023, RIACT filed a complaint seeking redress for a violation of their federal constitutional right to be free from an uncompensated taking of private property. ECF No. 1. Their amended complaint (which is the operative complaint) names three state officials as defendants in their official capacities, including the Rhode Island Attorney General. ECF No. 11. The complaint does not seek damages, but asks for prospective equitable relief from the enforcement of the Act, including, but not limited to, a preliminary injunction.

### STANDARD OF REVIEW

A district court may grant a preliminary injunction if the moving party shows: (1) a substantial likelihood of success on the merits; (2) a likelihood of suffering

irreparable harm in the absence of relief; (3) the balance of equities favors the movant; and (4) the injunction is in the public interest. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). To demonstrate likelihood of success on the merits, plaintiffs must show a "reasonable likelihood" that they will prevail. *Jean v. Mass. State Police*, 492 F.3d 24, 26–27 (1st Cir. 2007). A movant can establish the existence of "irreparable harm" by demonstrating that it likely has "no adequate remedy at law." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). The balance of the equities and the public interest factors "merge when the Government is the opposing party" to the preliminary injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## SUMMARY OF ARGUMENT

Under the *Ex parte Young* doctrine, plaintiffs may "seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law" without violating a state's sovereign immunity. *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021). The *Ex parte Young* exception to sovereign immunity applies whenever a "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective," *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002), including to complaints raising federal takings claims. *See Asociación De Subscripción*, 484 F.3d at 24; *Ortiz De Arroyo v. Barcelo*, 765 F.2d 275, 280 (1st Cir. 1985) (stating, in an *Ex parte Young* takings case against state officials, "[t]he court may not award the value of the diminished property right; it may issue only declaratory or injunctive relief").

RIACT's complaint seeks an injunction to stop the Act from effecting an ongoing violation of their constitutional right to be free from an uncompensated taking of property, and is thus proper under *Ex parte Young*. *Soscia Holdings, LLC v. Rhode Island*, No. 22-cv-266, 2023 WL 4230720, at *8 (D.R.I. June 15, 2023) (holding that takings claims "fall within the *Ex parte Young* exception" and survive sovereign immunity to the extent they "seek[] prospective injunctive relief against [state officials]").

Issuance of a preliminary injunction to halt the enforcement of the Act is warranted because RIACT is likely to prevail on the merits of its takings claim and its members will suffer irreparable harm without an injunction due to lack of an adequate monetary remedy. As to the merits, under state common law in force for over a century, the public has rights in the shore only to the MHW line, not to the more inland "high tide"/seaweed line. *Ibbison*, 448 A.2d at 732. Conversely, many private titles to beachfront land, including those held by RIACT members, extend to the MHW line and include property lying between the MHW line and ten feet inland of the seaweed line. Ex. 1 at 1, ¶ 4 (Welch Dec.). In authorizing public use of all shorelands up to ten feet inland of the high tide/seaweed line, the Act grants the public a right to invade all private land, including that of RIACT members, lying between the MHW line and ten feet inland of the high tide line/seaweed line. The Act takes an access easement on this area of private land, which strips the fee owners of their fundamental and constitutionally protected right to exclude non-owners from private property. *Nollan*, 483 U.S. at 834 ("requiring uncompensated conveyance of

the [access] easement outright would violate the Fourteenth Amendment"). The Act accordingly causes a per se, physical taking of property, and since it provides no mechanism for compensation, it is unconstitutional. *Cedar Point*, 141 S. Ct. at 2074 ("[G]overnment-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings[.]").

RIACT members are likely to suffer irreparable harm without issuance of an injunction halting the unconstitutional enforcement of the Act. Irreparable harm exists when an injured plaintiff has no adequate monetary remedy. When state sovereign immunity bars a plaintiff from securing a damages remedy in federal court, as it does in this case, no adequate monetary remedy exists, and irreparable harm is present. *Odebrecht Constr., Inc. v. Sec'y, Florida Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) ("[N]umerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable.").

Furthermore, when damages cannot be accurately measured, alleged monetary remedies are inadequate. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18–19 (1st Cir. 1996). Here, the public easement which the Act imposes on beachfront property, like that held by RIACT's members, is uncertain in its physical size (width) because it is defined by a migratory boundary marker (i.e., the high tide/seaweed line). It is also uncertain as to the scope of the "rights" and "privileges" in private land that it grants to the public. Thus, it is not possible to accurately ascertain the amount of "just compensation" for a taking of property

effected by the Act. This renders monetary remedies inadequate and injunctive relief warranted. *Ross-Simons of Warwick*, 102 F.3d at 18–19.

Indeed, because the boundaries of the easement created by the Act (like the seaweed line) shift based on natural forces, property owners subject to the Act will have to file new takings claims when erosion inevitably moves the seaweed line boundary (and the easement) farther into private property. The likelihood that multiple suits will be needed to secure full compensation confirms that monetary remedies are inadequate. *Terrace v. Thompson*, 263 U.S. 197, 214 (1923) (to qualify as "adequate," a "legal remedy must be as complete, practical and efficient as that which equity could afford"); 11A Charles Alan Wright et al., Federal Practice and Procedure § 2944 (3d ed. 2013) (stating a legal remedy may be deemed inadequate and equitable relief is proper "if plaintiff demonstrates that effective legal relief can be secured only by a multiplicity of actions, as, for example, when the injury is of a continuing nature, so that plaintiff would be required to pursue damages each time plaintiff was injured") (footnotes omitted).

Finally, a preliminary injunction will not harm the public. Since the public did not have a beach easement on RIACT members' private land prior to the recent enactment of the Act, an injunction will take nothing from the public. It will simply return beaches to the status quo ante. Requiring the officials to abide by the Constitution before taking private land for public beach access purposes is in the public interest. *See Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997) ("It

is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law[.]").

## ARGUMENT

## I.   RIACT IS LIKELY TO SUCCEED ON ITS TAKINGS CLAIM

### A.   RIACT Will Show That the Act Unconstitutionally Takes Private Property

RIACT is likely to prevail on its claim that the Act effects an unconstitutional taking of private property by extending public beach access inland onto private property located between the MHW line and ten feet inland of the seaweed or high water line. *See Cedar Point*, 141 S. Ct. at 2072 (a law granting union organizers "a right to physically enter and occupy" private property was "a *per se* physical taking" because it "appropriates for the enjoyment of third parties the owners' right to exclude").

### 1.   Takings standards

The Takings Clause of the Fifth Amendment prohibits uncompensated takings of private property. U.S. Const. amend. V. A "taking" occurs when government action results in a physical invasion of property. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). Indeed, a physical invasion or occupation of property constitutes a taking without regard for the public purpose for the invasion, its size, or its duration. *Cedar Point*, 141 S. Ct. at 2074.

The most obvious example of a taking arising from a physical invasion is when the government invades property for its own use. But it also occurs when it authorizes third parties, such as members of the public, to invade private land. *Cedar Point*, 141

S. Ct. at 2072; *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982); *Nollan*, 483 U.S. at 833. The authorization of public access into private land is sometimes described as a taking of an "easement," *Cedar Point*, 141 S. Ct. at 2073. The Supreme Court has made clear that whether called an "easement" or not, governmental authorization of a public right to invade land violates the Takings Clause. *Id.*; *Nollan*, 483 U.S. at 834 ("requiring uncompensated conveyance of the [access] easement outright would violate the Fourteenth Amendment"); *Kaiser Aetna v. United States*, 444 U.S. 164, 180 (1979). Indeed, it is not necessary for actual public trespassing to be complete for authorization of an easement to qualify as a per se taking. *Cedar Point*, 141 S. Ct. at 2073. The grant of a *public right to access private land* is sufficient to trigger takings liability. *Kaiser Aetna*, 444 U.S. at 180 (A taking occurs "even if the Government physically invades only an easement in property."); *Cedar Point*, 141 S. Ct. at 2072.

Appropriation of a public access easement over private land so readily qualifies as a taking because it deprives the underlying property owner of the "right to exclude others" from their property. *Nollan*, 483 U.S. at 831–32. This right, which includes the subsidiary right to control entry onto one's land, is one of "the most essential sticks" in the bundle of property rights. *Kaiser Aetna*, 444 U.S. at 176; *id.* at 179–80 ("[T]he 'right to exclude,' so universally held to be a fundamental element of the property right . . . cannot [be] take[n] without compensation.") (footnote omitted); *Nollan*, 483 U.S. at 831–32; *Hendler v. United States*, 952 F.2d 1364, 1378 (Fed. Cir. 1991). When government authorizes a public invasion of private land, it takes away

18

an important property right—the right to exclude—from the owner and a per se taking arises. *Cedar Point*, 141 S. Ct. at 2073.

> **2.** **The Act takes property by imposing a public beach easement on all private beach land located inland of the MHW line**

As previously noted, it is the settled common law rule in Rhode Island that public beaches extend no further inland than the MHW line, and private property begins at that point. The Act therefore takes private property by imposing a public beach easement on all private land lying inland of the MHW line, between the MHW line and ten feet inland of the high water/seaweed line. In granting the public an access easement on private land, "a permanent and continuous right to pass to and fro," *Nollan*, 483 U.S. at 832, between the MHW line and ten feet inland of the seaweed line, the Act deprives the owners of their property interests, including their right to lawfully exclude strangers. *See* R.I. Gen. Laws § 11-44-24. Members of the public have already entered RIACT members' private land under authority of the Act. Ex. 1 at 4–5 (Welch Dec.). The result is a classic per se, physical taking of property. *Nollan*, 483 U.S. at 832 (a physical taking occurs "where individuals are given a permanent and continuous right to pass to and fro" on private beach land); *Cedar Point*, 141 S. Ct at 2072–73; *Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 950–51 (11th Cir. 2018) (government authorization and encouragement of public use of private coastal land caused a taking).

Application of the Act to the property of RIACT President David Welch illustrates its confiscatory effect. Welch's beachfront property extends down to the MHW line, and the seaweed/high water line is always landward of the MHW line and

currently sits about thirty feet inland of the MHW line. Ex. 1 at 2, ¶ 10 (Welch Dec.); *id.* at 4, ¶ 23. By granting the public a right to invade Welch's land lying between the MHW line and ten feet inland of the seaweed line, the Act has given the public access to (1) thirty feet of Welch's land lying landward of the MHW, plus (2) the ten-foot strip lying landward of the seaweed line, a taking of approximately forty feet (in width) of Welch's land. *See Nollan*, 483 U.S. at 832–33. It is true that this amount may expand or contract as wave action moves the seaweed line back and forth on Welch's property. But because the seaweed/recognizable high water line (and the additional ten-foot strip) is *always* more landward than the MHW line boundary of Welch's title, Ex. 2 (Act) at 3:28–29; Ex. 3 at 6 (Shoreline Commission Report), there is no circumstance in which the Act will not take some property from owners like Welch. Finally, since the Act creates a public right-of-way on his land, Welch is now at risk of civil and criminal penalties if he attempts to exclude the public from his beachfront property. *See* R.I. Gen. Laws § 11-44-24.

The Act has the same appropriative effect along the state's entire coastline. Again, the Act authorizes public access up to the high water line, plus an extra ten feet inland, dramatically expanding the public beach area from its pre-Act common law boundary at the MHW line. *Ibbison*, 448 A.2d at 732. In thus extending public access to the ten feet inland of the high water line/seaweed line, the Act has encumbered every private parcel lying above the MHW line with a public easement, subjecting those areas to public invasion and stripping the owners of their right to exclude. *Cedar Point Nursery*, 141 S. Ct. at 2074 ("government-authorized invasions

of property—whether by plane, boat, cable, or *beachcomber*—are physical takings") (emphasis added); *id.* at 2073 ("appropriation of an easement constitutes a physical taking"). It does not matter that, for some coastal owners, the pubic access rights granted by the Act may be limited to the ten-foot strip above the high water/seaweed line. A taking arises from authorization of a public invasion of property without regard for "the size of the area" subject to occupation. *Loretto*, 458 U.S. at 436–37; *Lingle*, 544 U.S. at 538 (a compensable taking arises when "government requires an owner to suffer a permanent physical invasion of her property—however minor").

Many other states have concluded that statutes like the Act are unconstitutional as an uncompensated taking. For instance, in *Purdie v. Attorney General*, 732 A.2d 442 (N.H. 1999), the New Hampshire Supreme Court struck down a statute, like the one here, that extended the public beach to the "high water mark." Finding that New Hampshire common law "limits public ownership of the shorelands to the mean high water mark," and that "the legislature went beyond these common law limits by extending public trust rights to the highest high water mark," *id.* at 447, the court held that the statute "authorizes the taking of private shoreland for public use and provides no compensation for landowners whose property has been appropriated" and, as a result, "it violates . . . the Fifth Amendment of the Federal Constitution." *Id.*

Similarly, in *Opinion of the Justices*, 313 N.E.2d 561 (Mass. 1974), the Massachusetts Supreme Court considered whether a law that granted the public a "right-of-passage" on private land lying between the mean low tide line and MHW

line caused a taking. Under state common law, the property was subject to only a few public rights, like fishing. *Id.* at 565. The Massachusetts court held that the law's attempt to introduce pedestrian use on the private land was a taking. The court stated that the law "proposes to take easements for the benefit of the public," which "involves a wholesale denial of an owner's right to exclude," and thus "[t]he permanent physical intrusion into the property of private persons, which the bill would establish, is a taking of property within even the most narrow construction of that phrase." *Id.* at 568.

Finally, in *Bell v. Town of Wells*, 557 A.2d 168 (Me. 1989), the Supreme Judicial Court of Maine considered the constitutionality of a law which granted the public a broad recreational easement over private intertidal property. The court concluded: "the common law has reserved to the public only a limited easement; the [] Act takes a comprehensive easement for 'recreation' without limitation. The absence of any compensation to the fee owners renders the Act unconstitutional." *Id.* at 179. The court thus held that the law was unconstitutional on its face. *Id.* at 177.

There is nothing special about the Rhode Island Act that would justify any different treatment than that afforded to similar beach access legislation found to be a taking. The Act is clear in its purpose to extend public beach access onto coastal parcels that are landward of the MHW line, which were previously private under state common law. *Ibbison*, 448 A.2d at 732. While the goal may be laudable, the means are unconstitutional. The legislature cannot simply declare that the public has access and use rights in previously private land without providing a

22

contemporaneous, certain, and prompt mechanism for compensating all affected property owners. Because the Act does not do that, it violates the Takings Clause of the Fifth Amendment.

### 3. The legislature cannot disavow common law property rights without causing a taking

The officials will likely argue that the Act is permissible legislation because the state legislature has authority to abrogate common law property rules, such as the MHW beach boundary line, and to adopt a different rule. But this argument fails. While state legislatures generally have authority to alter common law property rules, that power is constrained by the United States Constitution, including the Takings Clause. *Phillips v. Washington Legal Found.*, 524 U.S. 156, 167 (1998) (The state may not "sidestep the Takings Clause by disavowing traditional property interests long recognized under state law."); *Webb's Fabulous Pharmacies v. Beckwith*, 449 U.S. 155, 164 (1980) (the state "may not transform private property into public property"); *Hall v. Meisner*, 51 F.4th 185, 190 (6th Cir. 2022) ("[T]he Takings Clause would be a dead letter if a state could simply exclude from its definition of property any interest that the state wished to take.").

The Rhode Island General Assembly does not have power to define away pre-existing property boundaries in a manner that takes private property interests in violation of the Takings Clause. *Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*, 560 U.S. 702, 713 (2010) ("States effect a taking if they recharacterize as public property what was previously private property.") (citing *Webb's Fabulous Pharmacies*, 449 U.S. at 163–65); *Purdie*, 732 A.2d at 447 ("Although the legislature

has the power to change or redefine the common law . . . property rights created by the common law may not be taken away legislatively without due process of law.") (citations omitted). But that is exactly what the Act has done. By moving the public beach inland from its traditional terminus at the MHW line to ten feet landward of the high water line/seaweed line, the Act burdens and takes upland areas of property that were previously private under state law. Without a mechanism for just compensation, which the Act fails to provide, the Act's reclassification of private beachfront property into a public area is an unconstitutional taking.

It makes no difference that state officials apparently believe the Act simply "clarifies" pre-existing property rights. It is the impact of government action on property rights that matters for Takings Clause purposes, not its characterization. *Lingle*, 544 U.S. at 539. The Act overturns the MHW-based property boundary regime that limited public beach rights to the MHW line (and seaward) for the last century, in favor of a "high water line plus ten feet" regime that gives the public a wider beach at the expense of private owners. The officials cannot evade the invasive and confiscatory effect of this action by calling it a mere "clarification" of state law. *Cedar Point*, 141 S. Ct. at 2076 ("property rights 'cannot be so easily manipulated'") (citation omitted).

## II.    RIACT HAS NO ADEQUATE COMPENSATORY REMEDY DUE TO THE UNCERTAIN SIZE AND SCOPE OF THE EASEMENT, AND WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION

RIACT is not only likely to prevail on the merits, but its members face irreparable harm if the court does not enjoin enforcement of the Act. Irreparable harm exists when there is no adequate monetary remedy. *Ross-Simons of Warwick*,

102 F.3d at 18–19. To be adequate, a legal remedy "must be as complete, practical and efficient as that which equity could afford." *Terrace*, 263 U.S. at 214. When a movant will suffer an injury that is "not accurately measurable," alleged damages remedies are inadequate and "irreparable harm" exists. *Ross-Simons of Warwick*, 102 F.3d at 19.

RIACT members have no adequate remedy at law for the ongoing, unconstitutional imposition of a public easement on their lots because sovereign immunity bars monetary damages against state officials. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Due to sovereign immunity, RIACT can obtain only prospective, equitable relief against the officials, and this damages barrier justifies a finding of irreparable harm. *See also Chamber of Commerce v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury."); *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983).

Moreover, even if a procedure for obtaining damages were generally available, it would be inadequate in this particular case because damages cannot be accurately calculated for the taking of property occurring under the Act. The easement granted to the public by the Act reaches into private land, up to ten feet from the "recognizable high tide line"/seaweed line. The high water/seaweed line that locates this easement is not a static boundary marker, but is instead a migratory one that will shift farther inland onto private property with stronger wave action and tides, or retreat seaward with calmer seas. The public easement imposed by the Act is therefore indefinite in

size and constantly changing in location. It is impossible to gauge the burden on private property that such an encumbrance will impose over time, and thus, impossible to gauge the damages to the owners at one point in time. *See generally*, *Hickey v. Town of Burrillville*, 713 A.2d 781, 785 (R.I. 1998) (stating, in a case of an easement taking, "to determine the value of damages to which the Hickeys are entitled, we must first endeavor to discern the exact property interest the town claimed by condemnation"). To obtain full compensation for an easement that migrates inland with natural forces, swallowing more property over time, affected fee owners will almost surely have to file multiple lawsuits. This confirms the lack of an adequate compensatory remedy and presence of irreparable harm. *Ross-Simons of Warwick*, 102 F.3d at 19 (when damages are "not accurately measurable . . . irreparable harm is a natural sequel"); *Pharmaceutical Research & Mfrs. of Am. v. Williams*, 64 F.4th 932, 945 (8th Cir. 2023) (holding that a facial takings plaintiff did not have an adequate legal remedy because it would have to "litigate a multiplicity of suits" to secure full compensation); *see also Di Giovanni v. Camden Fire Ins. Ass'n*, 296 U.S. 64, 70 (1935) ("Avoidance of the burden of numerous suits at law between the same or different parties, where the issues are substantially the same, is a recognized ground for equitable relief in the federal courts.").

The difficulty in reaching a just and certain damages calculation for the easement taken here is compounded by the fact that the Act does not state what "rights" and "privileges" the public has in the easement. Easements are valued (and compensation for their taking, calculated) based on the monetary loss they impose on

the fee estate, which in turns depends on the nature of the easement burden. *Hickey*, 713 A.2d at 785–86 (damages for a permanent easement are calculated "in light of the most injurious use that the town might make of its easement rights"); *Burke-Tarr Co. v. Ferland Corp.*, 724 A.2d 1014, 1021 (R.I. 1999) ("We conclude that this measure of liability [for an easement] . . . [is] the value of the servient estate, as diminished, if at all, by the additional burden" of the easement's use.). Here, the Act does not articulate the scope of the permissible public uses of private land between the MHW line and ten feet inland of the seaweed line. In short, since the scope of the public easement imposed on RIACT members is uncertain, its effect on private property values cannot be reasonably calculated, and any purported compensatory remedy is therefore not "complete, practical," or adequate. *Terrace*, 263 U.S. at 214.

Courts are prone to find that "irreparable harm" exists when dealing with injuries to real property, *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991) ("In cases involving real property, we have often found the irreparability of the injury to be of paramount concern."), and a preliminary injunction is warranted in this property rights case for the foregoing reasons. *Id.*; *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) ("An 'irreparable harm requirement is met if a plaintiff demonstrates a *significant risk* that he or she will experience harm that cannot be compensated after the fact by monetary damages.'") (citation omitted); *see also Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 479–80 (1st Cir. 2009) (affirming issuance of preliminary injunction against state officials in a takings case arising under *Ex parte Young*).

Issuing such an injunction will not harm the public interest. Since the public never had a beach easement on private property located landward the MHW line prior to the Act, an injunction will take nothing from the public. It will simply return property interests along the coast to the pre-Act status quo and ensure that countless coastal owners do not have their property rights and investments suddenly and unconstitutionally injured. It is always in the public interest to ensure that state laws are enforced constitutionally. *Maine Forest Products Council v. Cormier*, 586 F. Supp. 3d 22, 64 (D. Me. 2022) ("The public has a stronger interest in ensuring the constitutionality of state laws, and protecting constitutional rights[.]").

## STATEMENT REQUESTING ORAL ARGUMENT

Plaintiff RIACT requests oral argument on this motion and anticipates that it will require approximately one-half hour of argument time.

DATED: July 25, 2023.

Respectfully submitted,

/s/ J. David Breemer
J. DAVID BREEMER, *Pro Hac Vice*
Cal. Bar No. 215039
JEREMY TALCOTT, *Pro Hac Vice*
Cal. Bar No. 311490
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
JBreemer@pacificlegal.org
JTalcott@pacificlegal.org

/s/ Daniel J. Procaccini
DANIEL J. PROCACCINI (#8552)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, Rhode Island 02903-1345
Telephone: (401) 274-7200
Facsimile: (401) 351-4607
dprocaccini@apslaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July, 2023, the foregoing motion and

exhibits were delivered by personal service on the following:

Sarah W. Rice
Jeff Kid
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903

/s/ J. David Breemer
J. DAVID BREEMER, *Pro Hac Vice*

29